**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-1958**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff – Appellant,

v.

WOMBLE CARLYLE SANDRIDGE & RICE, LLP,

Defendant – Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:13-cv-00046-CCE-LPA)

Argued:  May 13, 2015                    Decided:  June 26, 2015

Before NIEMEYER, DUNCAN, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Susan L.P. Starr, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  Jill S. Stricklin, CONSTANGY, BROOKS & SMITH, LLP, Winston-Salem, North Carolina, for Appellee.  **ON BRIEF:** P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Office of General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant.  W.R. Loftis, Jr., CONSTANGY, BROOKS & SMITH, LLP, Winston-Salem, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The Equal Employment Opportunity Commission ("EEOC") appeals the district court's grant of summary judgment in favor of Womble Carlyle Sandridge & Rice, LLP ("Womble Carlyle") on the EEOC's claim under Title I of the Americans with Disabilities Act ("ADA"). For the following reasons, we affirm.

I.

A.

Womble Carlyle is a full service, business law firm comprised of over 500 lawyers in 14 offices. The Winston-Salem, North Carolina, location is composed of a main office, at One West Fourth Street, and two satellite buildings, Liberty Plaza and Winston Tower.

Among other staff, the firm employs about 15 Support Services Assistants ("SSAs"), who have the following duties:

> to provide basic, entry-level operating functions, such as operating high-volume copy and scanning machines and performing associated tasks, shipping and receiving products and supplies, handling incoming and outgoing mail and other correspondence, handling basic maintenance and repair of copiers, making offsite pick-ups and deliveries, responding to and coordinating service calls, as well as binding documents, conducting quality control checks on work done in the Support Services Center, performing basic housekeeping/hospitality functions, working in the internal message center, and performing other duties as assigned.

J.A. 34–35. Many of these functions require heavy lifting, and the performance of any of the listed functions may be required during any given shift. As one SSA explained in her deposition, "We basically do whatever they need us to do." J.A. 350. During a typical shift, many SSAs are present, which allows those employees to share and divide tasks based on availability. However, SSAs are also required to work shifts alone, either on Saturdays based on a rotating schedule, or at the satellite buildings.

Charlesetta Jennings, the complainant, began work at the firm as an SSA in April 2000. She worked primarily in the copy room, where she copied, scanned, and printed documents. But she also performed other tasks, such as delivering mail to each floor ("floor runs") of the One West Fourth Street location, assisting with express-delivery shipments, filling in for receptionists during their breaks and vacations, and handling the range of tasks that arose during her shifts on Saturdays or at Liberty Plaza and Winston Tower.

In July 2008, Jennings was diagnosed with breast cancer. She had surgery the next month and, after taking a short leave of absence, returned to work in September 2008. She took intermittent leave while undergoing chemotherapy treatments until January 2009.

In November 2009, Jennings noticed tenderness and swelling in her left arm. Doctors diagnosed Jennings with lymphedema, a condition caused by breast cancer treatment and which affects the circulatory and immune systems. It is triggered by heavy lifting. Following the diagnosis, although her work sometimes required lifting heavy items such as packages or boxes of paper, Jennings devised alternate methods for accomplishing those tasks and was able to avoid further injury for about seven months.[1]

Unfortunately, in June 2010, Jennings suffered an injury at work due to unavoidable heavy lifting. She was working alone at Liberty Plaza and, in order to prepare a shipment, "had to tape up and move about 14 boxes ranging in weight from 32 to 38 pounds each in addition to moving some paper boxes weighing 50 pounds each from one location to another." J.A. 76. Because of the location of the scale used to weigh the boxes, Jennings was not able to use any of the alternate methods she had used at other times to avoid the heavy lifting. This undertaking caused

---

[1] For example, in order to move multiple boxes of paper using a hand cart, instead of lifting each box and placing it on the cart, Jennings would slide the first box onto the cart, then wheel the cart to the next box, which was stacked high enough for her to slide it onto the cart as well. And to prepare heavy shipments, instead of filling a box and then lifting it onto the scale, Jennings would put the empty box on the scale, add the contents to be shipped a bit at a time, slide it off of the scale, tape it up, slide it onto a chair, and then roll the chair to where the package needed to be left for shipment.

4

pain and swelling in her left arm.  Jennings missed the next two days of work.  She returned on the third day after the injury, but had to leave early because, while working alone at Winston Tower, she had to move some FedEx boxes weighing between 10 and 30 pounds, and she "could feel . . . the soreness in [her] shoulder."  J.A. 228.

After the incidents, Jennings submitted a doctor's note to Womble Carlyle that stated that, due to the risk of lymphedema, she could not lift more than 10 pounds.  After learning of the lifting restriction, Womble Carlyle's Office Manager and Support Services Manager conferred to determine what SSA functions Jennings could and could not perform.  They determined that she was unable to perform the following functions:

- working alone at Liberty Plaza or Winston Tower
- working alone on Saturdays
- copying and scanning documents without assistance
- managing supplies
- setting up conference rooms
- loading or unloading trucks
- delivering or picking up packages offsite
- delivering to, or picking up mail or packages from, the post office or offices within the Womble Carlyle buildings
- delivering and receiving packages on an express basis
- assisting with office moves for attorneys or other personnel
- performing hospitality and housekeeping tasks
- managing files

5

J.A. 39–43. By contrast, the managers determined that Jennings, lifting restriction notwithstanding, <u>could</u> perform the following functions:

- copying and scanning documents with assistance
- delivering confidential light-weight envelopes within the firm
- performing quality checks (e.g., making sure copies matched originals)
- filling in for receptionists on breaks or out of the office

J.A. 45–46. By Jennings's account, she was also able to copy and scan documents without assistance and prepare heavy shipments using her alternate work methods.

Womble Carlyle accommodated Jennings's 10-pound lifting restriction for about six months by assigning her light-duty work. For example, between August 2010 and November 2010, she was able to spend approximately one-third of her working hours on a large scanning project. Even though the boxes containing the documents to be scanned weighed between 30 and 50 pounds, she was able to avoid lifting over 10 pounds by using modified work methods. <u>See</u> J.A. 273–74. In addition to working on the scanning project during this time, Jennings also filled in for receptionists who were out of the office; delivered small items within the building; performed quality checks, book binding, print jobs, and Bates stamping; sorted mail; sent faxes; and assisted with light-weight express-delivery packages and workspace clean-up. Tasks she had performed prior to her

6

injury, but which she did not do during this time, included making floor runs, assisting with express-delivery packages weighing more than 10 pounds, and filling in at the satellite buildings.

Jennings's supervisors testified that after the scanning project was complete, she was often idle at work because of her limitations. One supervisor estimated that she worked no more than 20% of each day. Jennings, by contrast, testified that the reduction in work after the scanning project was "[n]o more than normal," and was instead the result of the unpredictable daily workload. J.A. 278-79.

On February 1, 2011, Jennings provided Womble Carlyle with an updated doctor's note stating that she could lift up to 20 pounds. Both Jennings's and Womble Carlyle's understanding was that this restriction was permanent. Womble Carlyle's Office Manager then reassessed Jennings's capabilities, concluding that the list of tasks she could and could not perform with a 10-pound limit remained the same even with the 20-pound limit. The Office Manager also considered whether Womble Carlyle could transfer Jennings to another job position. Although she concluded that Jennings might be qualified to work as a receptionist or message center operator, those positions were already filled.

On February 9, 2011, the Office Manager placed Jennings on a medical leave of absence. When it ran out in August 2011, Womble Carlyle terminated her employment.

B.

Jennings filed charges of discrimination with the EEOC, alleging that Womble Carlyle violated Title I of the ADA. The EEOC brought suit based on those charges in the United States District Court for the Middle District of North Carolina. Womble Carlyle moved for summary judgment, which the district court granted on the ground that, at the time she was fired, Jennings could not perform the essential functions of her job with or without reasonable accommodation, and no reasonable jury could find otherwise.

First, the district court concluded that lifting more than 20 pounds was an essential function of the job. In so deciding, the court relied on the SSA job description, the judgment of Womble Carlyle's managers, the experience of SSAs as described through deposition testimony, and the firm's proffered consequences of removing all heavy-lifting tasks from an SSA's duties--namely that other SSAs would have to work harder and longer, and the overall flexibility of the team would be diminished. Citing <u>Dropinski v. Douglas County</u>, 298 F.3d 704 (8th Cir. 2002), which held that an employee's "specific personal experience is of no consequence in the essential

8

functions equation," id. at 709, the court focused on the SSA position generally, even though there were some heavy-lifting tasks that Jennings had never been required to do. Indeed, the court noted that "it is undisputed that all SSAs, including Ms. Jennings, were routinely required to perform some tasks involving heavy lifting and that even if certain SSAs had primary responsibility for these tasks, others were required to fill in as needed." EEOC v. Womble Carlyle Sandridge & Rice, LLP, No. 1:13-CV-46, 2014 WL 2916851, at *6 (M.D.N.C. June 26, 2014).

Second, the district court concluded that Jennings could not lift more than 20 pounds even with reasonable accommodation. Even though she could get around some heavy-lifting tasks by using modified work methods, there were too many tasks she could not perform with modifications. She could not:

> work at Liberty Plaza or Winston Tower, work the Saturday shift, deliver mail to the floors, deliver boxes of copy paper, pick up or deliver copy jobs weighing more than twenty pounds, lift or carry packages weighing over twenty pounds that needed to be shipped or mailed, move heavy furniture, or complete other tasks that involved or could involve lifting more than twenty pounds.

Id. at *7. The court concluded that it would not be reasonable to excuse Jennings from all those tasks "because doing so would force Womble Carlyle to create a modified light-duty position, which the ADA does not require." Id. (citing Shin v. Univ. of

9

Md. Med. Sys. Corp., 369 F. App'x 472, 482 (4th Cir. 2010)). The court also concluded that it would not be reasonable to require Womble Carlyle to assign one or more SSAs to help Jennings with all heavy-lifting tasks, as that "would in effect reallocate essential functions, which the ADA does not require." Id. (citing Shin, 369 F. App'x at 482). The EEOC timely appealed.

## II.

"We review the grant of summary judgment de novo, using the same standards as applied by the district court." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 771 (4th Cir. 1997). Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In making this determination, we "must review the record 'taken as a whole' . . . [and] draw all reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

10

III.

On appeal, the EEOC argues that the district court erred in granting summary judgment for Womble Carlyle because Jennings could perform the essential functions of the SSA job even without reasonable accommodation.  Alternatively, it argues that requiring other SSAs to help with tasks that involve lifting over 20 pounds is a reasonable accommodation that would have enabled Jennings to perform the essential functions of the job. We disagree.  In the discussion that follows, we begin with a brief discussion of the governing legal framework, and then consider (1) whether Jennings could perform the essential functions of the job; and (2) if she could not, whether the EEOC identified a reasonable accommodation that would have enabled her to do so.

A.

Under Title I of the ADA, an employer cannot "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  Id. § 12111(8).  "[E]ssential functions of the job[] [are] functions that bear more than a marginal relationship to the job."  Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994) (quoting Chandler

11

v. City of Dallas, 2 F.3d 1385, 1393 (5th Cir. 1993)); accord 29 C.F.R. § 1630.2(n)(1).

The plaintiff "bears the burden of demonstrating that [the complainant] could perform the essential functions of her job." Tyndall, 31 F.3d at 213. It satisfies that burden by showing that she could perform the essential functions "with or without reasonable accommodation." 42 U.S.C. § 12111(8). The term "reasonable accommodation" means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability . . . to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). While "reallocating or redistributing nonessential, marginal job functions" is a potential reasonable accommodation, 29 C.F.R. pt. 1630 app. § 1630.2(o), an accommodation is not reasonable under the ADA if it "reallocate[s] essential functions," id.; accord Shin, 369 F. App'x at 482; see also Peters v. City of Mauston, 311 F.3d 835, 845 (7th Cir. 2002) (holding that the employee's request that someone else do the heavy lifting for him was "unreasonable because it [would] require[] another person to perform an essential function of [the] job").

B.

Turning to the merits of EEOC's appeal, we hold that summary judgment was appropriate because the record in this case shows beyond dispute that (1) Jennings could not perform an essential function of the job; and (2) the EEOC has identified no reasonable accommodation that would satisfy its burden to show the contrary.[2]  We discuss each of these conclusions in turn.

1.

We first conclude that, because the SSA position is multifaceted--requiring the ability to perform a wide variety of tasks during any one shift--and many of those tasks could at any time require lifting over 20 pounds, the ability to lift that amount is an essential function of the job.  In determining

_____

[2] We reject the EEOC's argument that Womble Carlyle violated the ADA by failing to engage in an interactive process to identify a reasonable accommodation for Jennings.  "The duty to engage in an interactive process . . . is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability," Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346-47 (4th Cir. 2013), and there is no evidence in the record indicating that Jennings ever requested an accommodation.  In fact, she testified that she did not tell anyone that she needed an accommodation before her disability leave.  J.A. 286.  And even if Womble Carlyle's duty to engage in the interactive process was triggered, "an employer who fails to engage in the interactive process will not be held liable if the [plaintiff] cannot identify a reasonable accommodation that would have been possible."  Wilson, 717 F.3d at 347.  The EEOC has identified no such accommodation.

whether a responsibility is an essential function of a job, we look to the general components of the job rather than to the employee's particular experience. That an employee may typically be assigned to only certain tasks of a multifaceted job "does not necessarily mean that those tasks to which she was not assigned are not essential." Phelps v. Optima Health, Inc., 251 F.3d 21, 26 (1st Cir. 2001); see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175–76 (10th Cir. 1999) (holding that the district court properly considered the essential functions of the position for which the plaintiff was hired, as opposed to those of the narrower position to which she was assigned). Here, it is undisputed that the SSA position requires the ability to perform a wide variety of tasks. As discussed above, the SSA duties are numerous and varied, see J.A. 34–35, and as one SSA testified, "We basically do whatever they need us to do," J.A. 350. Even though Jennings worked primarily in the copy room, she could have, at any time, been called upon to move heavy furniture or carry heavy packages. As the district court summarized, "it is undisputed that all SSAs, including Ms. Jennings, were routinely required to perform some tasks involving heavy lifting and that even if certain SSAs had primary responsibility for these tasks, others were required to fill in as needed." EEOC, 2014 WL 2916851, at *6.

14

In addition, it is undisputed that many SSA tasks require lifting over 20 pounds. Both Jennings's own testimony and that of other SSAs confirm this. For example, Jennings testified that she was, at times, assigned to help with express-delivery packages that weighed over 20 pounds, J.A. 174; do floor runs, which required lifting heavy mail buckets, J.A. 177-78; and work alone at Liberty Plaza, which involved lifting more than 20 pounds, J.A. 198-99. Indeed, it was lifting boxes weighing over 20 pounds at Liberty Plaza that caused Jennings's injury in June 2010. J.A. 76. Other SSAs also testified to being called upon to lift heavy express-delivery packages, J.A. 342-43, carry 50-pound boxes, J.A. 363-64, and help with office moves, J.A. 366, among other heavy-lifting tasks.

Because so many facets of the SSA job may at any time require lifting over 20 pounds, the ability to do so "bear[s] more than a marginal relationship to the job," and is thus an essential function of the position. Tyndall, 31 F.3d at 213. And because Jennings was unable to lift that amount, she was unable to perform an essential function of the job.

The EEOC's arguments to the contrary are unpersuasive. First, the EEOC argues that, despite Jennings's inability to lift more than 20 pounds, she could nevertheless perform the essential functions of the SSA job, as evidenced by her strong performance reviews. In support of this contention, the EEOC

15

states: "It is uncontested that Jennings performed her job at Womble Carlyle for years, between 2008 and 2011, working at both satellite buildings and on Saturdays, and received only good performance reviews with no official complaints and no reprimands and that she did this without lifting more than twenty pounds." Appellant's Br. at 19. The EEOC's argument is refuted by both the record and Jennings's own experience. Her testimony reflects that she did lift more than 20 pounds prior to her injury, and her alternate work methods did not prevent her from having to lift more than 20 pounds and injuring herself.

Relatedly, the EEOC argues that Jennings's work-around methods enabled her to perform enough functions of the job such that the ability to lift over 20 pounds was non-essential. To be sure, Jennings was able to devise ways to do some tasks, but she remained unable to do many more. She could not work alone at Liberty Plaza or Winston Tower or on Saturdays, assist with office moves, deliver or pick up packages from offsite or among any of the three Womble Carlyle buildings, set up conference rooms, or any of a number of tasks. Thus, even though Jennings's work-around methods enabled her to perform a small subset of the job's responsibilities, the ability to lift over 20 pounds was inextricably tied to the vast majority of them. Accordingly, Jennings's own experience demonstrates that the

16

ability to lift that amount was an essential function of the SSA job--which she was unable to perform. Cf. Miller v. Ill. Dep't of Corr., 107 F.3d 483, 484-85 (7th Cir. 1997) (deeming a correctional officer unable to perform the essential functions of the job where her legal blindness enabled her to perform only a few administrative tasks, but prevented her from performing any inmate control or safety functions).

## 2.

Because we conclude that Jennings could not perform an essential function of the job, she was not a qualified individual unless the EEOC has carried its burden to show that a reasonable accommodation would have enabled her to do so. We agree with the district court that it has not.

Excusing Jennings from all heavy lifting would not have been a reasonable accommodation, and the EEOC does not argue to the contrary. Moreover, requiring assistance for all tasks that involve lifting more than 20 pounds would reallocate essential functions, which the ADA does not require. See 29 C.F.R. pt. 1630 app. § 1630.2(o). And it is undisputed that assistance was not always available, such as when Jennings was working alone.

## IV.

We are not unsympathetic to Jennings's situation. Indeed, we admire her pluck and innovative attempts to prevent injury.

17

Womble Carlyle, too, appears to have been impressed with Jennings, describing her as "a very hard worker," J.A. 470, with "a positive attitude," J.A. 510. However, the unfortunate truth is that, because of Jennings's disability, she is unable to perform an essential function of the SSA job without a serious risk of further injury. For that reason, the judgment of the district court is

AFFIRMED.